UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
BIJAN KARIMIAN,

                Plaintiff,

    -against-                              10 Civ. 3773 (AKH)

TIME EQUITIES, INC., FRANCIS GREENBURGER,
individually and in his official capacity, ROBERT       **FIRST AMENDED COMPLAINT**
KANTOR, individually and in his official capacity,
HYMAN SCHERMER, individually and in his official    JURY TRIAL DEMANDED
capacity,

                Defendants.
----------------------------------------------------------------x

       Plaintiff Bijan Karimian, by his attorneys Himmel & Bernstein, LLP, hereby complaining of the defendants Time Equities, Inc., Francis Greenburger, Robert Kantor and Hyman Schermer (collectively, "Defendants"), alleges as follows:

       1.    Plaintiff Bijan Karimian brings this action against defendants for violation of his rights under the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000-e, et. seq. ("Title VII"), the New York City Human Rights Law, NYC Administrative Code Sec. 8-101, et seq. (the "NYCHRL"), and the New York State Human Rights Law, NYS Executive Law Sec. 290, et seq. (the "NYSHRL"), and for breach of contract and quantum meruit.

## I.    THE PARTIES

       2.    Plaintiff Bijan Karimian ("Plaintiff" or "KARIMIAN") is an individual and resides at 240 E. 76th Street, Apt. 6R, New York, New York in the State, County and City of New York.

       3.    Upon information and belief, defendant Time Equities, Inc. ("TIME") is a New York corporation with its principal place of business at 55 Fifth Avenue, New York, New York.

       4.    At all relevant times herein, TIME was an "employer" within the meaning of Title VII, the NYSHRL and the NYCHRL.

5. Upon information and belief, defendant Francis Greenburger ("GREENBURGER") is the Chairman of TIME and worked at 55 Fifth Avenue, New York, New York.

6. Upon information and belief, defendant Robert Kantor ("KANTOR") is the President of TIME and worked at 55 Fifth Avenue, New York, New York.

7. Upon information and belief, defendant Hyman Schermer ("SCHERMER") was a co-employee of Plaintiff and, at all times relevant, worked as, and continues to work as, a senior member of TIME'S Acquisitions Department at 55 Fifth Avenue, New York, New York.

8. Upon information and belief, TIME was founded in 1966 by GREENBURGER and is a national real estate company involved in acquiring, owning and operating real estate properties in the United States, Canada and Germany.

## II. JURISDICTION AND VENUE

9. Jurisdiction of this court is invoked pursuant to 28 U.S.C. §1331. Further, this court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

10. Venue lies in the United States District Court for the Southern District of New York in that Defendants "reside" in the Southern District of New York and/or all of the unlawful acts complained of were committed within the Southern District of New York within the meaning of 28 U.S.C. §§ 1391(b)(1) and (2).

11. On or about August 18, 2009, Plaintiff filed a charge alleging unlawful discrimination on the basis of sex, race and national origin and retaliation against Defendants with the U.S. Equal Employment Opportunity Commission, as required by 42 U.S.C. §2000e-5. That charge has not been resolved by informal means. A Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission was issued on February 12, 2010. The initial complaint was filed within 90 days of Plaintiff's receipt of the Notice of Right to Sue.

### III.     FACTUAL BACKGROUND

11.     Plaintiff is a 41 year old native of Teheran, Iran who immigrated to the United States as a child in or about 1974 and is now an American citizen.

12.     Plaintiff was raised, although today non-practicing, as a member of the Baha'i Faith which is an ostracized and persecuted minority in Iran.

13.     Plaintiff graduated from George Mason University in 1991. Plaintiff received a Masters of Business Administration from the Business School at Indiana University in May 2000.

14.     Plaintiff worked as a financial institution examiner for the Federal Deposit Insurance Corporation and as a senior credit analyst for the National Cooperative Bank. Plaintiff has also held a position in the banking and finance industry specializing in mergers and acquisitions.

15.     In November 2006, Plaintiff was hired by TIME as an Associate Director in TIME's Acquisition Department.

16.     At the time he was hired, TIME provided Plaintiff with an employee handbook setting forth certain rights, responsibilities and expectations of both TIME and Plaintiff with regard to Plaintiff's employment (the "Handbook").

17.     More specifically, the Handbook sets forth what constitutes inappropriate workplace conduct and how it is to be addressed, as well as the procedures to be followed in the evaluation and termination of employees.

18.     As TIME's President KANTOR was charged with, among other things, the responsibility of dealing with and investigating violations of the Handbook, including but not limited to complaints of discrimination and retaliation.

19.     Upon information and belief, GREENBURGER, as TIME's Chairman was also responsible for dealing with, and investigating, violations of the Handbook.

3

20. During his employment at TIME, Plaintiff was given increased responsibilities and received positive reviews and evaluations for his work from GREENBURGER.

21. As an Associate Director, Plaintiff, among other things:

   a. Played a substantial role in the acquisition and underwriting of two Manhattan office buildings worth in excess of $130 million for conversion to office condominiums.

   b. Underwrote and bid on an additional $3 billion of office and retail real estate for acquisition.

   c. Developed a companywide financial model to analyze office building acquisition opportunities and project the profitability of converting office buildings to office condominiums.

   d. Led efforts to identify and evaluate new commercial real estate research tools and ways to improve operating efficiency including new subscriptions to REIS, and expanded subscriptions to CoStar Group Services.

   e. Plaintiff also led efforts to develop a new company website and modified and improved the acquisition database to avoid conflicts and improve workflow.

22. In November 2007, Plaintiff received a positive annual review from GREENBURGER and a promotion to Project Director of Acquisitions reporting directly to GREENBURGER.

23. As a Project Director Plaintiff, among other things:

   a. Sourced an acquisition of office, multi-family, retail and industrial properties in New York, Washington, DC, Chicago, and Minneapolis markets.

   b. Played a substantial role in the underwriting and efforts to acquire a 99-year leasehold interest on a 340,000sf Manhattan office building worth in excess of $200 million. Plaintiff also helped renegotiate a lease agreement and

4

participation structure with a lessor including the contract's reset clause for lease payments to avoid timing and volatility risk. This yielded annual lease payments of $15.5 million compared to $21.1 million for a $5.6 million annual savings.

c. Played a substantial role in the negotiations and structuring of a joint-venture partnership to assume control of a 250,000sf Manhattan office building worth in excess of $100 million; evaluated subject property for conversion to office and residential condominiums.

d. Played a substantial role in TIME'S first effort to invest in South America through an equity participation in a $16 million, 22-unit luxury condominium development in Lima, Peru.

e. Underwrote and submitted bids on over $2 billion worth of institutional class office, multi-family and retail properties in the eastern U.S.

f. Worked with asset management team to identify needed capital improvements on approximately 800,000sf of office properties.

g. Managed solicitation and bidding for capital improvement projects and filed and obtained tax abatements under New York City's ICIP program. Plaintiff also worked with tax certiorari to appeal real estate assessments.

h. Helped hire, supervise, and train an analyst.

24. In March 2007 GREENBURGER asked Plaintiff to manage a personal investment GREENBURGER wanted to make in a company called Hemosense, Inc. ("Hemosense"). Plaintiff's efforts in managing the Hemosense investment for GREENBURGER ultimately netted GREENBURGER approximately $230,000 in profits.

25. GREENBURGER also asked Plaintiff to manage a discretionary fund of his.

26. Throughout his tenure with TIME, Plaintiff worked in the same department as SCHERMER and attended two to three meetings a week with SCHERMER.

27. During Plaintiff's tenure, SCHERMER provoked a fractious and contentious relationship with Plaintiff motivated entirely by an ethnic animus towards Plaintiff.

28. On several occasions, SCHERMER made crude sexual and ethnic remarks to Plaintiff that were at times threatening and hostile.

29. In addition, SCHERMER made numerous comments about how "Israel is going to bomb Iran and kill a lot of Iranians." SCHERMER also frequently used profanity when these comments were made to Plaintiff.

30. For example, in early July 2008 while in Plaintiff's office, SCHERMER repeated comments similar to the ones outlined in paragraph 29. These comments were extremely hostile and laced with profanity, directed at Plaintiff as an ethnic Iranian. Plaintiff expressed no interest in continuing the conversation with SCHERMER and advised him to leave Plaintiff's office.

31. On or about July 15, 2008, SCHERMER stated to Plaintiff that "I'm going to fuck you in your little Iranian ass" in front of co-employee Chris Pulling, an analyst shared by Plaintiff and SCHERMER.

32. In or about November 2008, Plaintiff met with GREENBURGER for the first of several conversations regarding Plaintiff's annual performance review for the period November 2007 through October 2008.

33. During this second meeting to discuss Plaintiff's 2007/2008 performance review, GREENBURGER told Plaintiff that Plaintiff had not succeeded "in building a comfortable relationship" with SCHERMER. GREENBURGER further stated that he was unhappy with the strained and fractious relationship he observed between Plaintiff and SCHERMER, and that Plaintiff would have to learn to work well with SCHERMER.

34. Plaintiff told GREENBURGER that SCHERMER had been making obnoxious and rude comments. But, when Plaintiff attempted to give GREENBURGER examples of what

6

SCHERMER had actually said, GREENBURGER stated that he "didn't want to know why" this strained relationship existed.

35. GREENBURGER'S refusal to hear Plaintiff's side of the story effectively closed off Plaintiff's opportunity to inform him of SCHERMER'S ethnic bias and crude threatening remarks which had sparked the alleged problem.

36. GREENBURGER took such action despite the fact that both the Handbook and his position as Chairman of TIME imposed on him an obligation to hear and investigate

37. Upon information and belief, SCHERMER was a close friend and associate of GREENBURGER for many years prior to the Plaintiff coming to work at TIME.

38. Realizing this issue was not going to dissipate given GREENBURGER'S relationship with SCHERMER, who had worked for TIME FOR more than 10 years, Plaintiff made a complaint to GREENBURGER about SCHERMER'S biased and discriminatory statements.

39 On or about December 12, 2008, Plaintiff met with GREENBURGER and told him that SCHERMER's ethnic bias against him made it difficult for him to work with SCHERMER, and that SCHERMER did not like him because he was of Iranian descent.

40. In addition, on December 12, 2008 Plaintiff also told GREENBURGER of the crude threat made to him by SCHERMER on or about July 15, 2008 as recited above in paragraph 29.

41. Following this December 12, 2008 meeting with GREENBURGER, GREENBURGER's attitude towards Plaintiff changed abruptly, and their once solid working relationship deteriorated rapidly.

42. GREENBURGER embarked on a course of retaliation aimed at punishing Plaintiff, damaging him financially and professionally, and pushing him out of the company.

43. Prior to the December 12, 2008 conversation Plaintiff had received a very favorable review from GREENBURGER for his work for the period November 2007 through

7

October 2008, a 3% raise, which was the maximum being given to employees that year, and a 10% bonus.

44. Following Plaintiff's December 12, 2008 complaint of discrimination to GREENBURGER, GREENBURGER, and by extension TIME, among other things:

  a. Refused to pay Plaintiff the promised compensation he was due for managing GREENBURGER'S investment in Hemosense.

  b. Told Plaintiff that his job was not secure.

  c. Decided not to move forward with a potentially lucrative deal Plaintiff had been actively working on in Lima, Peru and that GREENBURGER and TIME had expressed great interest in, and were moving forward on, prior to the December 12, 2008 meeting.

  d. Decided to pursue a deal that Plaintiff had been actively working on prior to December 12, 2008 through a third party (416 Washington).

45. Following a company meeting Plaintiff attended on January 13, 2009, Plaintiff asked GREENBURGER if he could stay and talk with him about some work they were doing together. During this conversation GREENBURGER asked Plaintiff to "propose a pay cut" for himself in order to keep his job. GREENBURGER then said they would discuss the pay cut on January 15, 2009 after Plaintiff told him he would be out of the office on January 14, 2009.

46. Instead of meeting with Plaintiff on January 15, 2009 to discuss the "pay cut" as agreed, GREENBURGER emailed Plaintiff on January 14, 2009, while Plaintiff was out of the office, and advised Plaintiff that he was being terminated as of January 28, 2008 "because of the economic environment."

47. At the time he was terminated, Plaintiff and SCHERMER were the only members of the Acquisition Department who had recently presented deals which TIME was actively pursuing,

8

48.     Upon information and belief, at the time he was terminated, no other full-time employees of TIME were laid off from the Acquisitions Department.

49.     Plaintiff was also denied an opportunity to maintain his position and accept a pay cut as part of TIME's companywide pay reduction plan that was announced on January 30, 2009, two days after Plaintiff's last day of work.

50.     Upon information and belief, following Plaintiff's termination by TIME, GREENBURGER intentionally and maliciously gave poor recommendations to prospective employers who inquired about Plaintiff.

## IV.     FIRST CAUSE OF ACTION
### (TITLE VII Discrimination Claim Against Defendant TIME)

51.     Plaintiff repeats and reallages each and every allegation contained in paragraphs 1 through 50 of this Complaint with the same force and effect as if fully set forth herein.

52.     Between November 2006 and January 28, 2009, KARIMIAN performed his job in a diligent, responsible and competent manner.

53.     At all times while employed by TIME, KARIMIAN was qualified for the position he held as a Project Director in TIME's Acquisitions Department.

54.     TIME discriminated against Plaintiff based on his national origin, race, and sex/gender in violation of Title VII's prohibition against such discriminatory practices in the workplace.

55.     At all times relevant to this complaint, TIME was aware of the prohibitions against discriminating against an employee on the basis of national origin, race, and sex/gender, but nonetheless intentionally discriminated against Plaintiff on these bases.

56.     By virtue of the foregoing, Plaintiff has suffered, and continues to suffer, damages due to TIME'S violation of Title VII, in an amount no less than Three Million ($3,000,000) Dollars.

9

57.     TIME's conduct was purposeful, deliberate, intentional and done with reckless disregard for the rights and welfare of Plaintiff.

58.     By virtue of the foregoing, Plaintiff is also entitled to recover punitive damages from TIME in an amount no less than Seven Million ($7,000,000) Dollars.

## V.     SECOND CAUSE OF ACTION
### (TITLE VII Retaliation Claim Against Defendant TIME)

59.     Plaintiff repeats and reallages each and every allegation contained in paragraphs 1 through 58 with the same force and effect as if fully set forth herein.

60.     TIME retaliated against KARIMIAN when it, among other things, terminated Plaintiff for asserting his lawful rights under Title VII to work in an environment free from discrimination.

61.     The retaliatory acts on the part of TIME were taken against Plaintiff for resisting, opposing, defying and standing up to the violation of his rights under Title VII.

62.     By virtue of the foregoing, Plaintiff has suffered, and continues to suffer, damages due to TIME's violation of Title VII in the amount of at least Three Million ($3,000,000) Dollars.

63.     TIME's conduct was purposeful, deliberate, intentional and done with reckless disregard of the rights of KARIMIAN.

64.     By virtue of the foregoing, Plaintiff is also entitled to recover punitive damages from TIME in an amount no less than Seven Million ($7,000,000) Dollars.

## VI.   THIRD CAUSE OF ACTION
### (NYCHRL Discrimination Claim Against All Defendants)

65.   Plaintiff repeats and reallages each and every allegation contained in paragraphs 1 through 64 of this Complaint with the same force and effect as if fully set forth herein.

66.   Between November 2006 and January 28, 2009, KARIMIAN performed his job in a diligent, responsible and competent manner.

67.   At all times while employed by TIME, KARIMIAN was qualified for the position he held as a Project Director in TIME's Acquisitions Department.

68.   Defendants discriminated against Plaintiff based on his national origin, race, and gender in violation of the NYCHRL's prohibition against such discriminatory practices in the workplace.

69.   At all times relevant to this complaint, Defendants were aware of the prohibitions against discriminating against an employee on the basis of national origin, race, and gender, but nonetheless intentionally discriminated against Plaintiff on these bases.

70.   By virtue of the foregoing, Plaintiff has suffered, and continues to suffer, damages due to Defendants' violation of the NYCHRL in an amount no less than Three Million ($3,000,000) Dollars.

71.   Defendants' conduct was purposeful, deliberate, intentional and done with reckless disregard for the rights and welfare of plaintiff.

72.   By virtue of the foregoing, Plaintiff is also entitled to recover punitive damages from Defendants in an amount no less than Seven Million ($7,000,000) Dollars.

## VII.   FOURTH CAUSE OF ACTION
### (NYCHRL Retaliation Claim Against Defendants TIME, GREENBURGER and KANTOR)

73.   Plaintiff repeats and reallages each and every allegation contained in paragraphs 1 through 72 with the same force and effect as if fully set forth herein.

11

74. TIME, GREENBURGER and KANTOR retaliated against Plaintiff when they terminated him for asserting his lawful rights under the NYCHRL to work in an environment free from discrimination.

75. The retaliatory acts on the part of TIME, GREENBURGER and KANTOR were taken against Plaintiff for resisting, opposing, defying and standing up to the violation of his rights under the NYCHRL.

76. By virtue of the foregoing, Plaintiff has suffered, and continues to suffer, damages due to TIME's, GREENBURGER's and KANTOR's violation of the NYCHRL in the amount of at least Three Million ($3,000,000) Dollars.

77. TIME's, GREENBURGER's and KANTOR's conduct was purposeful, deliberate, intentional and done with reckless disregard of the rights of KARIMIAN.

78. By virtue of the foregoing, Plaintiff is also entitled to recover punitive damages from TIME, GREENBURGER and KANTOR in an amount no less than Seven Million ($7,000,000) Dollars.

### VIII.   FIFTH CAUSE OF ACTION
### (NYSHRL Discrimination Claim Against all Defendants)

79. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 78 with the same force and effect as if fully set forth herein.

80. Between November 2006 and January 28, 2009, KARIMIAN performed his job in a diligent, responsible and competent manner.

81. At all times while employed by TIME, KARIMIAN was qualified for the position he held as a Project Director in TIME's Acquisitions Department.

82. Defendants discriminated against Plaintiff based on his national origin, race, and gender in violation of the NYSHRL's prohibition against such discriminatory practices in the workplace.

83. At all times relevant to this complaint, Defendants were aware of the prohibitions against discriminating against an employee on the basis of national origin, race, and gender, but nonetheless intentionally discriminated against Plaintiff on these bases.

84. By virtue of the foregoing, Plaintiff has suffered, and continues to suffer, damages due to Defendants' violation of the NYSHRL in an amount no less than Three Million ($3,000,000) Dollars.

## IX.  SIXTH CAUSE OF ACTION
### (NYSHRL Retaliation Claim Against Defendants TIME, GREENBURGER and KANTOR)

85. Plaintiff repeats and realleges the allegations in paragraphs 1 through 54 with the same force and effect as if fully set forth herein.

86. TIME, GREENBURGER and KANTOR retaliated against Plaintiff when they terminated him for asserting his lawful rights under the NYSHRL to work in an environment free from discrimination.

87. The retaliatory acts on the part of TIME, GREENBURGER and KANTOR were taken against Plaintiff for resisting, opposing, defying and standing up to the violation of his rights under the NYSHRL.

88. By virtue of the foregoing, plaintiff has suffered, and continues to suffer, damages due to TIME's, GREENBURGER's and KANTOR's violation of the NYSHRL in the amount of at least Three Million ($3,000,000) Dollars.

## X.  SEVENTH CAUSE OF ACTION
### (Breach of Contract Against Defendants TIME and GREENBURGER)

89. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 88 with the same force and effect as if fully set forth herein.

90. In or about March 2007 GREENBURGER entered into an agreement with Plaintiff whereby Plaintiff would, separate and apart from his duties as an employee of TIME, manage GREENBURGER's investment Hemosense by buying and selling Hemosense stock in

GREENBURGER's E-Trade investment account. In exchange, GREENBURGER agreed to pay Plaintiff for his successful efforts in managing this investment by way of additional compensation from TIME (the "Agreement").

91.  Plaintiff has performed all the duties and obligations required of him under the Agreement.

92.  From March 2007 through late February 2008, GREENBURGER realized approximately $230,000 in profits due to Plaintiff's efforts in buying and selling Hemosense shares on GREENBURG'S behalf.

93.  TIME and GREENBURGER breached the Agreement by failing to pay Plaintiff for his efforts in helping GREENBURGER realize approximately $230,000 in profits.

94.  Upon information and belief, industry standard for compensating a portfolio manager is 20% of profits.

95.  Upon information and belief, Plaintiff was entitled to compensation from TIME and GREENBURGER of no less than $46,000 for his work on Hemosense.

96.  This compensation was to be paid in addition to any compensation paid to Plaintiff by TIME for his work as an employee of TIME.

97.  At no time has either TIME or GREENBURGER ever made any payment to Plaintiff for managing the Hemosense investment.

98.  As such, Plaintiff is entitled to a judgment against TIME and GREENBURGER in an amount no less than $46,000 plus interest.

### XI.   EIGHTH CAUSE OF ACTION
### (Quantum Meruit Against Defendants TIME and GREENBURGER)

99.  Plaintiff repeats and reallages each and every allegation contained in paragraphs 1 through 98 with the same force and effect as if fully set forth herein.

14

100. Plaintiff provided, and TIME and GREENBURGER accepted, services from Plaintiff with regard to managing GREENBURGER's investment in Hemosense from March 2007 to late February 2008.

101. Such services were outside the scope and responsibilities of Plaintiff's employment with TIME.

102. As a result of Plaintiff's work managing GREENBURGER's investment in Hemosense, GREENBURGER realized approximately $230,000 in profits.

103. TIME and GREENBURGER were aware of and accepted the aforementioned services performed by Plaintiff with the knowledge that Plaintiff would be compensated for his services over and above any compensation he would be entitled to from TIME for his work for TIME.

104. This understanding and expectation that Plaintiff would receive compensation for his work is evidenced by, among other things, an interoffice memorandum at the time Plaintiff was terminated in which defendant GREENBURGER admits that he was to pay Plaintiff for his work on the portfolio account but simply claims that TIME already paid Plaintiff as part of his bonus covering the period November 2006 to October 2007, and a conversation in December 2008 where GREENBURGER offers to pay Plaintiff 3% of the profits for his efforts.

105. Despite his working for GREENBURGER and managing an investment in Hemosense stock for him from March 2007 through late February 2008, when all of GREENBURGER's holdings in Hemosense were liquidated, TIME and GREENBURGER have failed and refused to pay Plaintiff for such services which were separate and apart from his duties at TIME.

106. As TIME and GREENBURGER accepted Plaintiff's services managing the Hemosense investment for the period of March 2007 through late February 2008 without complaint or objection, and with the understanding that such services would be compensated

15

above and beyond his compensation as an employee of TIME, Plaintiff is entitled to recover the reasonable value of his services for this time and effort.

107. By virtue of the foregoing, it would be against good conscience for TIME and GREENBURGER to retain the benefit of Plaintiff's services in managing GREENBURGER's investment in Hemosense without compensating Plaintiff for those services.

108. TIME and GREENBURGER are therefore liable to Plaintiff pursuant to the principles of quasi contract and/or quantum meruit for the reasonable value of Plaintiff's services, in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment as follows:

(1). On the FIRST through SIXTH CAUSE OF ACTION RELIEF in an amount no less than $3,000,000 plus interest.

(2). On the FIRST THROUGH FOURTH CAUSES OF ACTION, punitive damages in an amount no less than $7,000,000.

(3). On the FIRST through SIXTH CAUSES OF ACTION, attorneys' fees and costs in an amount to be determined at trial

(4). On the SEVENTH CAUSE OF ACTION, in an amount no less than $46,000 plus interest.

(5). On the EIGHTH CAUSE OF ACTION, in an amount to be determined at trial plus interest.

(6). On the FIRST through EIGHTH CAUSES OF ACTION, such other and additional relief as this Court may deem just, appropriate and proper including costs and disbursements and interest.

Dated: New York, New York
September 22, 2010

Respectfully submitted,

Himmel & Bernstein, LLP

By: _____
Tracey S. Bernstein (TB 0405)
Attorneys for Plaintiff
928 Broadway, Suite 1000
New York, New York 10010
Ph: (212) 631-0200
Email: tbernstein@hbesq.com

To:

Jackson Lewis LLP
666 Third Avenue, 29th Floor
New York, NY 10017
Attorneys for Defendants